**UNITED STATES of America, Plaintiff,**

v.

**Jose Luis SANDOVAL–RUANO et al., Defendants,**

**Ruben Martinez-Rivera and Juventino Patricio-Barajas, other Defendants.**

**Crim. No. 77–0382.**

United States District Court, S. D. California.

Aug. 5, 1977.

---

Terry J. Knoepp, U. S. Atty., James A. Wilson, Asst. U. S. Atty., San Diego, Cal., for plaintiff.

Frank R. Murphy, III, San Diego, Cal., for Jose Luis Sandoval-Ruano.

David B. Moon, Jr., San Diego, Cal., for Juventino Patricio-Barajas.

Frank T. Vecchione, Federal Defenders of San Diego, Inc., San Diego, Cal., for Ruben Martinez-Rivera.

## MEMORANDUM OPINION AND ORDER

GORDON THOMPSON, Jr., District Judge.

The defendant was stopped by Border Patrol Agent Alfred Lopez at the traffic checkpoint on State Route 22 (S-22 checkpoint) at approximately 1:30 a. m. on May 11, 1977. Agent Lopez had only just arrived and begun to set up the checkpoint equipment at that night's location when he observed the defendants' approaching vehicle. In the few minutes before the stop of defendants, Agent Lopez had deployed only a single piece of checkpoint equipment, the tripod stop sign at the point vehicles are expected to stop. The remaining equipment—blinker lights, two warning signs reading "slow" and "stop ahead", and reflector cones set between these warning signs, lights and the stopping point—was lying on the side of the road next to Agent Lopez's patrol car at the time of the stop.

When he sighted the defendants' pickup approaching his location, Agent Lopez decided to stop the vehicle despite the fact that the checkpoint was not fully operational. To alert the oncoming vehicle of his intention to stop it, he turned on the red warning light of his border patrol car, which was parked on the opposite side of the road from the tripod stop sign, and positioned himself near the center line of S-22. Agent Lopez then signaled the driver to stop by pointing his flashlight at the approaching vehicle and waving the flashlight in an up and down motion. Instead of stopping, however, the defendants drove the pickup slowly by Agent Lopez.

As the pickup rolled by him, Agent Lopez recognized it to be the same car he had stopped a week earlier at the same checkpoint and in which he had found sixteen illegal aliens. He gave chase on foot, banging the side of the door as he ran alongside. After about 20 yards, the pickup stopped. Agent Lopez immediately recognized the driver and one of the passengers in the cab to be persons he apprehended a week earlier when stopping the same pickup. In addition the pickup cab was occupied by one other illegal alien and six more illegal aliens were found hiding in the bed of the pickup.

The defendants have brought a motion to suppress all evidence derived from the stop claiming that it was violative of the Fourth Amendment. The government has sought to justify the stop of defendants' pickup on two alternative grounds: first, the stop was based on founded (reasonable) suspicion, *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); second, even if not based on founded suspicion, the stop was at and pursuant to a valid, permanent, traffic checkpoint, *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). The facts adduced at the motions hearing, however, will not support either of these grounds and, therefore, the motion to suppress must be granted.

*A. Founded Suspicion*

■ The Ninth Circuit recently held:

When a law enforcement officer signals a motorist to stop by use of a siren or red light, there has been a seizure which must be justified under the Fourth Amendment. (Citations omitted). The seizure occurs when the officer first communicates the command to halt. The command must be valid when given;

. . . .

*United States v. Morrison,* 546 F.2d 319, 320 (9th Cir. 1976). When Agent Lopez turned on his vehicle's red light, communicating his command to stop, he was aware of no specific, articulable facts relating to the approaching vehicle which could give rise to founded suspicion. Thus, if this stop is to be upheld, it must be on the theory that founded or reasonable suspicion was unnecessary because the stop was at an operating and legitimate, permanent checkpoint. *Martinez-Fuerte, supra.*

*B. Permanent Traffic Checkpoint*

■ Unless a traffic checkpoint is in operation at the time a stop occurs, the fact that the stop is executed at a checkpoint location is of no consequence—founded suspicion is required. *Brignoni-Ponce, supra.* Although Agent Lopez was in the process of putting the S-22 checkpoint into operation at the time of the stop, he was not far

enough along in that process to justify a ruling that the checkpoint was in operation at the time of the stop. The Court's reading of *Martinez-Fuerte, supra,* and *United States v. Vasquez-Guerrero,* 554 F.2d 917 (9th Cir. 1977) (Oak Grove checkpoint upheld), indicates to it that the equipment most crucial to the concept of a permanent checkpoint is that which serve the function of giving motorists advance warning. It is such advance notice which serves to allay the subjective fear and concern of legitimate motorists, thereby lessening the degree of the Fourth Amendment intrusion:

At Oak Grove, there were significant indications that the stop was manned by official personnel acting in the course of their duties. A sign, highway cones and flashing lights provided advance warning of the stop. The traffic check van and the trailer at the site also provided indications of official authorization. Thus, as in *Martinez-Fuerte,* the Oak Grove checkpoint is unlikely to cause great fear or annoyance on the part of legitimate motorists.

*Vasquez-Guerrero, supra,* 554 F.2d at 920; *accord, Martinez-Fuerte, supra,* 428 U.S. at 558–59, 96 S.Ct. 3074. In this case the advance warning equipment had not been deployed when the stop occurred. The only *advance* warning given was that supplied by the patrol car's blinking hazard (emergency) lights, which provided an ambiguous warning likely to heighten rather than lessen fear and concern. The red light bar was not switched on by Agent Lopez until the approaching vehicle was approximately one hundred yards away; thus, it served a stopping function but not a warning function. As a result of the unannounced, irregular manner in which this stop was conducted and the isolated desert locale where it occurred, it more closely resembles a roving patrol stop than a checkpoint stop. *United States v. Ortiz,* 422 U.S. 891, 894–895, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), *quoted in Martinez-Fuerte,* 428 U.S. at 558, 96 S.Ct. 3074. Thus, founded suspicion was required but lacking.

738

However, even had the S-22 checkpoint been in full operation, it would not qualify as a permanent checkpoint as that term and concept is defined in *Martinez-Fuerte* and *Vasquez-Guerrero*. The question of whether a particular checkpoint is reasonably located and permanent so as to come within the ambit of *Martinez-Fuerte* is to be answered by balancing the public interest served by the checkpoint against its potential interference with Fourth Amendment rights. In the case of the S-22 checkpoint the public interest is weak due to very low traffic volume, while the potential interference with the Fourth Amendment rights of legitimate motorists is strong due to the lack of a permanent situs and the insufficiency of notice provided approaching motorists.

In reaching its conclusion that the public interest was served by the San Clemente checkpoint and the procedure of stopping all vehicles passing it, the Supreme Court identified heavy traffic flow as a crucial consideration:

A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens.

*Martinez-Fuerte, supra,* 428 U.S. at 557, 96 S.Ct. at 3082. In upholding the Oak Grove checkpoint, the Ninth Circuit likewise concluded that heavy traffic volume on State Route 79 made particularized inspection impractical. *Vasquez-Guerrero, supra* at 920 n. 3. The evidence adduced at the motions hearing regarding traffic flow on State Route 22, however, will not sustain a similar finding of impracticality. The govern-

ment's own witness testified that at its heaviest the traffic volume on State Route 22 never exceeds 100 vehicles per eight hours (length of a shift at the S-22 checkpoint).[1] Late at night the traffic drops off to a miniscule zero to six cars per eight hours. Gauging the applicable standard to those occasions when traffic is heaviest, *Vasquez-Guerrero, id.,* the traffic volume on State Route 22 is never so heavy as to make particularized inspection impractical. Even the highest traffic flow figure cited by the government, 100 cars per eight hours, would permit individual consideration of each passing vehicle for five minutes. The public interest in stemming the influx of illegal aliens can be fully served along State Route 22 by roving patrol stops based on reasonable (founded) suspicion.

There was a suggestion in the government's brief and in its argument at the motions hearing that the necessity of the S-22 checkpoint is conclusively established by its alleged integral relationship to the other checkpoints in the Border Patrol's checkpoint network. The argument is that each and every checkpoint is essential to prevent circumvention of the other checkpoints. Apparently the Border Patrol has wishfully and erroneously heretofore interpreted *Martinez-Fuerte* as a blank check authorizing a permanent traffic checkpoint on any route by which the checkpoints on *major inland routes* approved in *Martinez-Fuerte,* might be circumvented. The holding of *Martinez-Fuerte,* however, is obviously much too narrowly and carefully drafted to support such a "bootstrapping" interpretation.[2] Consideration must be given to the "big picture" when assessing the public interest served by a particular checkpoint, but *Martinez-Fuerte* requires a case by case, checkpoint by checkpoint determi-

1. This is to be compared to the 10 million cars which annually pass the San Clemente checkpoint, a volume so heavy that at peak traffic loads the checkpoint must be shut down. *Martinez-Fuerte, supra,* 428 U.S. at 554, & n. 10, 96 S.Ct. 3074. No statistics re traffic volume are included in *Vasquez-Guerrero, supra.*

2. In fact the Supreme Court in *Martinez-Fuerte* stated that one of the benefits of allowing per-

manent traffic checkpoints on "important highways" was that "the prospect of such inquiries forces others onto less efficient roads that are less heavily traveled [such as State Route 22], slowing their movement, and making them more vulnerable to detection by roving patrols." *Martinez-Fuerte,* 428 U.S. at 557, 96 S.Ct. at 3082.

nation of necessity, i. e. the impracticality of more particularized measures such as roving patrol stops, due to the broad-sweeping nature of the intrusion imposed by permanent checkpoints. In the case of State Route 22, low traffic volume makes roving patrol stops based on reasonable suspicion a feasible, less intrusive means of combatting the alien smuggling problem in that area. Of course, should traffic volume increase significantly on State Route 22, a permanent checkpoint, properly situated and operated, might be warranted.

■ Not only is there a lack of necessity for the S-22 checkpoint, but there is also a significant potential for violation of legitimate motorists' Fourth Amendment rights stemming from the manner in which the checkpoint is presently being operated. The S-22 checkpoint, although contended by the government to be a *permanent* checkpoint, has no permanent situs. Both the San Clemente and the Oak Grove checkpoints are permanently situated at one location. The precise location of the S-22 checkpoint ranges up to 3 miles and there was no indication by the government witnesses at the hearing that anyone other than the agents setting up the checkpoint on a given day or night chooses the exact location or influences that choice. The lack of a permanent situs selected by administrative officers with policy-making power is a serious deficiency given the Supreme Court's emphasis of and reliance on such a permanent situs in *Martinez-Fuerte. Martinez-Fuerte* at 559, 96 S.Ct. 3074. The Ninth Circuit in *Vasquez-Guerrero* also emphasized the permanency of the Oak Grove checkpoint's location:

> When the checkpoint is in operation, it is always located at the same site. Due to this permanency in location, motorists may obtain warning that they will be checked at that site rather than elsewhere. Motorists in general will not be taken by surprise.

*Vasquez-Guerrero, supra* at 921.

■ The Court is concerned with one other aspect of the manner in which the S-22 checkpoint is operated—the notice provided approaching motorists. In the Court's opinion, even when in full operation, the checkpoint on S-22 supplies inadequate advance warning of the *nature* of the impending intrusion. The S-22 checkpoint, when fully operational is set up so as to give bountiful notice that some sort of intrusion lies ahead, but it gives absolutely no notice of the nature of that intrusion. It is notice as to the nature of the impending intrusion that would most effectively allay the subjective fears and concerns of approaching motorists. Some advance warning of the nature of the intrusion is supplied at the San Clemente checkpoint by a large overhead sign stating "Stop Here—U. S. Officers".[3] Given the isolated, desert location of the S-22 checkpoint, full advance notice of the nature of the stop is essential. Such notice could be easily and painlessly provided by a large sign stating "Stop Ahead—U. S. Border Patrol."

The Court recognizes that its earlier conclusion as to the lack of necessity for a permanent traffic checkpoint on State Route 22 renders its findings and advice re permanency and notice somewhat superfluous. However, in light of the government's apparent intention to appeal this decision, the Court thought it best to cover all issues raised by the operation and location of the S-22 checkpoint.

IT IS ORDERED that defendants' motions to suppress evidence are granted.

---

3. There is no indication in *Vasquez-Guerrero* as to whether any advance notice of the nature of the impending intrusion is supplied at the Oak Grove checkpoint.